## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Betsey Jean Scott,                                   :          Case No. 4:09CV2684

      Plaintiff,                                  :

vs.                                                  :          **MAGISTRATE'S REPORT**
                                                                **AND RECOMMENDATION**
Commissioner of Social Security Administration,      :

      Defendant.                                  :

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § §§ 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties and Plaintiff's Reply (Docket Nos. 11, 13 & 14).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

### I.  PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on February 12, 2007 alleging that she became unable to work on October 1, 2006 because of her disabling condition (Docket No. 7, Exhibit 6, pp. 21-22 of 24).  The application was denied initially and upon reconsideration (Docket No. 7, Exhibit 5, pp. 2-4 of 31; 7-9 of 31).  On April 13, 2009, Administrative Law Judge (ALJ) Ronald A. Marks conducted a hearing

at which Plaintiff, represented by counsel, and George Durass, a Vocational Expert (VE) appeared and testified.  The ALJ issued an unfavorable decision on May 14, 2009 (Docket No. 7, Exhibit 2, pp. 14 -25 of 25).  The Appeals Council denied review of the ALJ's decision on September 19, 2009, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 7, Exhibit 2, pp. 2-4 of 25).

## II.  FACTUAL BACKGROUND

At the onset of the hearing, the ALJ granted counsel's request to amend the onset date of disability to October 27, 2007, the date of Plaintiff's fiftieth birthday (Docket No. 7, Exhibit 3, p. 6 of 40).  The facts that follow were presented during the testimony of Plaintiff and the VE

### A.  PLAINTIFF'S TESTIMONY.

Plaintiff studied accounting during two years of college (Docket No. 7, Exhibit 3, p. 36 of 40).  She lived in a two-story house with a friend who helped her maintain her home in exchange for room and board.  Plaintiff had no children or pets residing with her (Docket No. 7, Exhibit 3, pp. 17-18 of 40).  Plaintiff had a driver's  license and could drive; however, when driving applying the brake pedal was painful (Docket No. 7, Exhibit 3, pp. 16, 25).

From October 2006 to August 2007, Plaintiff worked part-time for a temporary agency (Docket No. 7, Exhibit 3, pp. 6-7 of 40).   Typically, she worked three to four days per week.  Her general assignment included work at a plastics plant.  Her responsibilities included work as a press operator or as quality control operator.  She performed her duties as a press operator in a seated position.  To perform her duties in quality control, Plaintiff stood for approximately two hours at a time.  As a result of the persistent standing, Plaintiff's knees became inflamed and swollen and she was terminated from her job  (Docket No. 7, Exhibit 3, pp. 6-8; 10; 12 of 40).

Plaintiff identified and/or was diagnosed with the following disorders:

2

- ▸ A 50% hearing loss in her right ear and 40% hearing loss in her left ear (Docket No. 7, Exhibit 3, p. 5 of 40).
- ▸ Arthritis in her knees (Docket No. 7, Exhibit 3, p. 18-19 of 40).
- ▸ Back pain not otherwise specified (Docket No. 7, Exhibit 3, pp. 19, 23 of 40).
- ▸ Bone spurs in her left foot, one under her big toe and one on the side (Docket No. 7, Exhibit 3, p. 22 of 40).
- ▸ Diabetes mellitus and diabetic neuropathy (Docket No. 7, Exhibit 3, pp. 22, 23, 29 of 40).
- ▸ Depression (Docket No. 7, Exhibit 3, pp. 27-29 of 40).
- ▸ Full remission from drugs and alcohol (Docket No. 7, Exhibit 3, p. 15 of 40).
- ▸ Muscle weakness and loss of strength in the leg muscles causing loss of balance and unsteadiness (Docket No. 7, Exhibit 3, pp. 19, 31 of 40)
- ▸ Occasional numbness in her fingers (Docket No. 7, Exhibit 3, p. 26 of 40).
- ▸ Occasional tinnitus (Docket No. 7, Exhibit 3, p. 14 of 40).
- ▸ Pain emanating from a torn meniscus in her left knee, which intensified when ambulating (Docket No. 7, Exhibit 3, pp. 19, 20 of 40).
- ▸ Persistent back pain that radiated to her legs, thighs and calves (Docket No. 7, Exhibit 3, p. 38 of 40).
- ▸ Severe knee and lower back pain (Docket No. 7, Exhibit 3, pp. 19-20 of 40).
- ▸ Severe shoulder pain (Docket No. 7, Exhibit 3, p. 24 of 40).
- ▸ Poor circulation radiating to elbow and both legs (Docket No. 7, Exhibit 3, p. 39).

For knee pain, Plaintiff took Mobic and applied cold and hot packs. She had undergone cortisone treatments, did leg exercises and had knee surgery (Docket No. 7, Exhibit 3, pp. 18, 21, 22, 30, 31 of 30). She walked using a cane and walker (Docket No. 7, Exhibit 3, p. 20 of 40). Plaintiff was prescribed an antidepressant to treat the symptoms of depression (Docket No. 7, Exhibit 3, p. 27 of 40). She also treated with a psychiatrist (Docket No. 7, Exhibit 3, p. 28 of 40) and attended Alcoholics Anonymous but not regularly (Docket No. 7, Exhibit 3, pp. 15-16 of 40).

Plaintiff's muscles became weak, stiff and swollen after she slept for a long time. It took her two and a half hours to dress herself (Docket No. 7, Exhibit 3, pp. 26-27 of 40). She estimated that she could stand and sit alternately for three hours (Docket No. 7, Exhibit 3, p. 30 of 40).

**B.     THE VE'S TESTIMONY**

The ALJ posed three questions involving the various physical and mental states of Plaintiff, the hypothetical worker.

1.     HYPOTHETICAL QUESTION NUMBER ONE:

The VE considered a hypothetical worker of Plaintiff's age, educational background, work experience and a residual functional capacity for light work.  This individual was required to refrain from:

- ▸     using ladders, ropes or scaffolds,
- ▸     balancing,
- ▸     using any foot controls bilaterally,
- ▸     working above shoulder level,
- ▸     exposure to concentrated exposure to noise or vibration,
- ▸     workplace hazards,
- ▸     occupational driving,
- ▸     being given verbal instructions.

The hypothetical individual was limited to:

- ▸     simple, one-two step routine procedures, and
- ▸     superficial interaction with supervisors.

(Docket No. 7, Exhibit 3, p. 34 of 40).

The VE responded that consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a hypothetical worker with this profile could perform jobs such as laundry folder, stocker and optical assembler.  There were 100,000 laundry folder jobs in the national economy, 120,000 stocker jobs in the national economy and 400,000 assembler jobs in the aggregate (Docket No. 7, Exhibit 3, p. 35 of 40).

2.     HYPOTHETICAL QUESTION NUMBER TWO.

The ALJ asked the VE to assume that the hypothetical worker was limited to sedentary work, i.e., standing and walking to two hours daily and a sit/stand option.  Although the DOT does not consider a sit/stand option, the VE explained that based on his personal observation and interpretation of jobs in this field, such limitations would not foreclose the performance of work as a laundry folder, stocker, and optical assembler (Docket No. 7, Exhibit 3, pp. 36-37 of 40).

3.     HYPOTHETICAL QUESTION NUMBER THREE

4

If the hypothetical worker needed a cane to ambulate and stand, the VE opined that he or she could not perform work as laundry folder, stocker, or optical assembler.

### III. MEDICAL EVIDENCE

The Warren West Community Health Center (WWCHC) monitored Plaintiff's chronic impairments of diabetes, irritable bowel syndrome, arthritis and gastric reflux from April 2, 2003 through February 27, 2007 (Docket No. 7, Exhibit 14, p. 3 of 6; Exhibit 15, pp. 2-4 of 4). Dr. Allen J. Budek of WWCHC found diagnostic evidence of chronic obstructive pulmonary disease (COPD) (Docket No. 7, Exhibit 16, p. 3 of 4; Exhibit 17, pp. 2-4 of 13, 8-9 of 13; Exhibit 23, p. 2 of 16).

Dr. Mark E. Davis addressed numerous conditions including eczema, fluctuating blood sugars, difficulty swallowing, sore throat and lack of insulin. Specifically, he treated Plaintiff for symptoms of gastritis on August 20, 2004 and sinus congestion on September 3, 2004 (Docket No. 7, Exhibit 20, pp. 9, 22 of 32). He treated the swelling and inflammation of Plaintiff's knees on May 3, 2007. On August 3, 2007, Dr. Davis diagnosed Plaintiff with chronic bilateral knee pain. He prescribed medication to treat the pain and swelling (Docket No. 7, Exhibit 20, p. 5 of 32; Exhibit 26, pp. 2-28 of 28; Exhibit 27, pp. 2-12 of 40).

Meanwhile, on September 13, 2005, Plaintiff's chest X-ray showed a normal cardiac silhouette and a normal aortic contour (Docket No. 7, Exhibit 13, p. 26 of 26).

On November 8, December 19 and December 29, 2005, Plaintiff obtained emergency medical treatment for a toothache (Docket No. 7, Exhibit 9, pp. 3-4, 11-12 of 13). Plaintiff's pain was generally attributed to tooth decay for which an antibiotic and pain reliever were prescribed (Docket No. 7, Exhibit 13, pp. 21-23 of 26).

Plaintiff was treated for hyperglycemia and heroin withdrawal on April 13, 2006 (Docket No. 7, Exhibit11, p. 2 of 39). Plagued by suicidal ideations and feelings of hopelessness, Plaintiff admitted

5

herself into the hospital.  She was diagnosed with and treated for depression complicated by polysubstance abuse (Docket No. 7, Exhibit 11, p. 3 of 39).  On April 17, 2006, Plaintiff underwent a "real-time" ultrasound examination with unremarkable results (Docket No. 7, Exhibit 12, p. 19 of 29).  Plaintiff was released on April 21, 2006, under the care of Valley Counseling Services, a behavioral healthcare provider.  At the time of her release, Plaintiff was "pleasant, smiled, not angry, not irritable, not suicidal" (Docket No. 7, Exhibit 11, p. 4, 16 of 39; http://www.vcsinc.org).

On September 8 2006, Plaintiff was treated at the St. Joseph Health Center for abdominal pain, constipation and diabetes.  The source of the pain could not be isolated as the magnetic resonance imaging (MRI) results were normal (Docket No. 7, Exhibit 13, p. 16 of 26).

The level of ferritin, the blood cell protein that contains iron, was elevated on August 14, 2006 (Docket No. 7, Exhibit 10, pp. 14 of 16).  On August 15, 2006, the computed tomography (CT) scan results of Plaintiff's abdomen/pelvis showed sigmoid diverticulitis and a left lump in tissue of the adnexa mass (Docket No. 7, Exhibit 10, p. 7of 16).  Evidence of COPD was detected from the diagnostic imaging of Plaintiff's chest administered on August 18, 2006 (Docket No. 7, Exhibit 10, p. 8 of 16).  No pathological diagnosis resulted from the endoscopic biopsy administered on August 12, 2006 (Docket No. 7, Exhibit 10, p. 12 of 16).  On August 30, 2006, the pathology report based upon the colonscopy showed an ascending colon (Docket No. 7, Exhibit 10, p. 11 of 16).

On August 23, 2006, Plaintiff consulted with Dr. Lee C. Laney, M. D., a gastroenterologist, about anti-reflux measures.  Prilosec supplemented with a dose of extra strength Mylanta® prior to the heaviest meal was recommended for treatment of reflux disease (Docket No. 7, Exhibit 21, p. 3 of 9).  On August 23, 2006, a procedure used to examine the lining of the upper part of the gastrointestinal tract showed the presence of moderate antral erosive gastritis, moderate distal inflammation of the esophagus lining and a hiatal hernia (Docket No. 7, Exhibit 12, p. 22 of 29).  The final diagnosis was gastric antrum,

6

chronic gastritis and no pathological diagnosis resulting from the esophageal biopsy (Docket No. 7, Exhibit 21, p. 4 of 9).  On August 30, 2006, Plaintiff underwent a full colonoscopy of the cecum and terminal ileum.  Test results showed  two rectal polyps and scattered diverticula (Docket No. 7, Exhibit 21, pp. 6-7 of 9).

Dr. Budek monitored the treatment plan of Plaintiff's diabetes on June 19 and August 16, 2006.  Generally, Plaintiff's diabetes and/or hypertension were uncontrolled (Docket No. 7, Exhibit 22, pp. 2, 4-5 of 5).  When Plaintiff presented for a diabetes checkup on November 3, 2007, her blood pressure was controlled but her diabetes was not.  Additional medication was added to control her glucose levels (Docket No. 7, Exhibit 23, p. 12 of 16).

Plaintiff presented to the emergency room on September 28, 2006, for care of a wound that appeared on the left of her posterior thigh.  Diagnosed with a bacterial skin infection, Plaintiff was prescribed an antibiotic, was given samples of a topical ointment and instructed to use warm compresses (Docket No. 7, Exhibit 13, pp. 15-16 of 26).

On February 1, 2007, Plaintiff presented to the emergency room with chronic nausea and diarrhea.  Several general blood screens and chemical analysis results showed the presence of gastroenteritis, an intestinal infection marked by watery diarrhea, abdominal pain and nausea or vomiting (Docket No. 7, Exhibit 13, p. 3-7 of 26; www.webmd.com/digestive-disorders;gastroenteritis). Plaintiff's lungs were clear and her heart and middle section of the chest cavity were unremarkable (Docket No. 7, Exhibit 13, p. 12 of 26).

Plaintiff was treated for right-hand pain on March 17, 2006.  The pain was attributed to mild osteoarthritis (Docket No. 7, Exhibit 13, p. 19 of 26).

After conducting a clinical interview on April 5, 2007, Dr. Stanley J. Palumbo, Ph. D., a clinical psychologist, diagnosed Plaintiff as having been opiate dependent in sustained full remission and alcohol

7

dependent in sustained full remission and as having a depressive disorder not otherwise specified.  He further opined that Plaintiff had some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well; had some meaningful interpersonal relationships (Docket No. 7, Exhibit 18, p. 30 of 30).

Transvaginal and transvesicle images of Plaintiff's pelvis administered on April 25, 2007, showed no sonographic abnormality (Docket No.  7, Exhibit 18, p. 6 of 30).

On April 27, 2007, Dr. Tonnie Hoyle, Psy. D., a clinical psychologist, opined that Plaintiff had a depressive disorder not otherwise specified.  Dr. Hyle concurred that Plaintiff's opiate and alcohol dependency were in sustained full remission.  Plaintiff had mild restriction of activities in daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace.  There were no episodes of deterioration of previously working systems (Docket No. 7, Exhibit 18, pp. 11-23 of 30).

On May 16, 2007, Plaintiff presented to WWCHC with cracked, dry hands and cramped toes. She was diagnosed with dermatitis (Docket No. 7, Exhibit 19, pp. 3-4 of 27).

On or about June 20, 2007, Dr. K. Brian Williams, Doctor of Osteopathy, concluded that Plaintiff had signs of cartilage deterioration in the back of the kneecap.  He recommended physical therapy (Docket No. 7, Exhibit 19 p. 8 of 27).  The physical therapist who evaluated Plaintiff for rehabilitation services on June 20, 2007, diagnosed Plaintiff with loss of articular cartilage bilaterally (chrondrolysis) (Docket No. 7, Exhibit 19, p. 5 of 27).  Plaintiff reported a meager improvement in pain on June 27, 2007, and her tolerance of pain improved (Docket No. 7, Exhibit 19, p. 20 of 27).  Plaintiff did not appear  for treatment on July 3, 2007; she tolerated the exercises well on July 6, 2007, and she did not appear for treatment sessions scheduled on July 13 and July 27, 2007 (Docket No. 7, Exhibit 19, pp. 23, 25-27 of 27).

8

Dr. Edmond Gardner, M. D., opined on September 12, 2007, that there were no manipulative, visual or communicative limitations (Docket 7, Exhibit 20, pp. 27-28 of 32).  Plaintiff did, however, have the following exertional limitations:

- ▸ Frequently lift and/carry ten pounds.
- ▸ Occasionally lift and/carry twenty pounds, kneel, couch, crawl or climb using a ramp, stairs, ladder/rope/scaffolds.
- ▸ Push and/or pull on an unlimited basis.
- ▸ Sit about six hours in an eight-hour workday.
- ▸ Stand and/or walk about six hours in an eight-hour workday.

(Docket No. 7, Exhibit 20, p. 25 of 32).

On September 23, 2007, Plaintiff's "bad" cholesterol, white blood cell and glucose levels were elevated.  The lymphocyte level was lower than normal (Docket No. 13, Exhibit 27, pp. 16-18 of 40).


In November 2007, Plaintiff underwent a sensory nerve conduction study.  The electromyography study showed normal results.  Specifically, there was no evidence of diabetic neuropathy, nerve injury or lumbar radiculopathy (Docket No. 7, Exhibit 24, p. 20 of 28).

Dr. Robert J. Brocker, Jr., M. D., addressed Plaintiff's complaints of pain in both knees and back on August 20, 2008.  He diagnosed Plaintiff with painful diabetic peripheral neuropathy.  A conservative treatment plan including drug therapy, physical therapy and lift changes were discussed (Docket No. 7, Exhibit 24, p. 2-4 of 28).

Plaintiff underwent an initial psychiatric evaluation at Valley Counseling on September 2, 2008, and was diagnosed with depression and anxiety (Docket No. 7, Exhibit 28, p. 11 of 24).  To regulate the symptoms, Plaintiff was prescribed an antidepressant (Docket No. 7, Exhibit 28, p. 19 of 24).

On September 18, 2008, Dr. Brocker noted that the electrodiagnostic testing showed prolonged H reflex which was compatible with sensory lumbar radiculopathy.  The diffuse slowing and lower

amplitude were compatible with diabetic and ischemic neuropathy (Docket No. 7, Exhibit 24, p. 6 of 28). On October 9, 2008, Plaintiff underwent an MRI of the lumbar spine. There was evidence of mild disk dehydration at L2-3 and L3-4 (Docket No. 7, Exhibit 24, p. 9 of 28). On October 23, 2008, Plaintiff was diagnosed with cervical radiculopathy and ischemic peripheral neuropathy (Docket No. 7, Exhibit 24, p. 11 of 28).

On November 7, 2008, Dr. Thomas Jones repaired a tear of the posterior horn of the medial meniscus (Docket No. 7, Exhibit 24, p. 22 of 28). Plaintiff alleged that the pain was gone on November 28, 2008 (Docket No. 7, Exhibit 24, p. 25 of 28).

In December 2008, Plaintiff complained of left arm pain. However, the MRI of the cervical spine did not show any abnormality (Docket No. 7, Exhibit 24, p. 13 of 28).

Plaintiff complained of left shoulder and back pain on January 8, 2009. The symptoms were attributed to diabetic peripheral neuropathy and ischemic peripheral neuropathy (Docket No. 7, Exhibit 24, p. 15 of 28).

In February 2009, Plaintiff tested positive for diverticulosis (Docket No. 7, Exhibit 25, p. 9 of 11). Diagnosing Plaintiff with inflammation of the tendons in her left shoulder, Dr. Jones initiated physical therapy for Plaintiff's left shoulder and left knee (Docket No. 7, Exhibit 24, p. 27 of 28; Exhibit 25, p. 11 of 11). The neurodiagnostic examination conducted on February 27, 2009, showed a normal left shoulder (Docket No. 7, Exhibit 27, p. 27 of 40).

Plaintiff's glucose level was considered "high" on March 3, 2009. Enzyme levels found in the liver were high and the thyroid-stimulating hormone levels were also "high" (Docket No. 7, Exhibit 27, pp. 30-31 of 40).

On March 3, 2009, Dr. William H. Lippy, M. D., an Otolaryngologist, conducted screening tests for hearing. Dr. Lippy interpreted the results to show that Plaintiff had a mild conductive hearing loss

in the left ear and a moderate conductive hearing loss in the right ear (Docket No. 7, Exhibit 27, p. 36 of 40).

Plaintiff complained that the left big toenail was ingrown and painful.  Dr. Diana G. Karnavas, a Podiatrist, performed a medical removal of Plaintiff's damaged or infected toenails on March 5, 2009 (Docket No. 7, Exhibit 27, p. 39 of 40).

On March 26, 2009, Plaintiff complained of left shoulder and back pain (Docket No. 7, Exhibit 28, p. 21 of 24).  The electrodiagnostic examination showed diffuse slowing and a lower amplitude compatible with diabetic and ischemic peripheral neuropathy (Docket No. 7, Exhibit 28, p. 22 of 24). The lumbar electromyogram showed no evidence of lumbar motor radiculopathy (Docket No. 7, Exhibit 28, p. 23 of 24).

### IV. STANDARD FOR ESTABLISHING DISABILITY

To be entitled to disability insurance benefits, an individual must be under a disability within the meaning of the Act.  *Rabbers v. Commissioner Social Security Administration*, 582 F.3d 647, 651 -652 (6th Cir. 2009) (*citing* 42 U.S.C. § 423(a)(1)(E)).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U. S. C. § 423(d)(1)(A)).  The individual also must be insured for disability insurance benefits, have not attained retirement age, and have filed an application for benefits.  *Id*. at 652 fn. 5 (*citing* 42 U.S.C. § 423(a)(1)).

The Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled.  *Id.* (citing 20 C.F.R. § 404.1520(a)).  If the claimant is found to be conclusively disabled or not disabled at any step, the inquiry ends at that step. *Id*.  The five steps are as follows:

11

(1)     If the claimant is doing substantial gainful activity, the claimant is not disabled.

(2)     If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

(3)     If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

(4)     If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

(5)     If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Id.* (citing 20 C. F. R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g); *see also Cruse v. Commissioner of Social Security*, 502 F.3d 532, 539 (6th Cir. 2007); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529 (6th Cir. 1997)).  The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner.  *Id.* (citing *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003)).

## V.  THE ALJ'S FINDINGS

The ALJ applied the governing five step analyses and determined that Plaintiff had not been under a disability within the meaning of the Act.

At step one, the ALJ found that Plaintiff had not engaged in work activity since February 12, 2007, the date the application for SSI was filed (20 C.F.R. § 404.1571 et seq.).

At step two, the ALJ found that Plaintiff had the following severe impairments:  chrondrolosis of the bilateral knees, left shoulder disorder, arthritis, bilateral hearing loss, diabetes mellitus, diabetic peripheral neuropathy, ischemic peripheral neuropathy, depressive disorder, not otherwise specified and opiate and alcohol dependence in sustained full remission.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1525 and 404.1526).  After careful consideration of the entire record, the ALJ determined that Plaintiff had the residual functional capacity to perform light work defined in 20 C. F. R. § 416.967(b) except that she could not use a ladder, rope or scaffold, do any balancing, use any foot controls on the right or left or work above her shoulders.  Plaintiff should avoid concentrated exposure to noise and vibration, workplace hazards and occupational driving.  There could be no verbal instructions.  Plaintiff must have a sit/stand option.  Plaintiff was limited to simple one to two-step procedures with limited superficial interaction with supervisors, coworkers and the public.

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.  Her skills did not transfer to other occupations within the residual functional capacity described above.

At step five, the ALJ determined Plaintiff's acquired job skills did not transfer to other occupations.  However, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that exist in significant number in the national economy that Plaintiff could perform, to wit, representative occupations include folder, stocker, assembler and optical industry assembler (Docket No. 7, Exhibit 2, pp. 14-25 of 25).

### VI.  STANDARD OF REVIEW

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions.  *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (1994).  Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards.  *Id*. (*citing Richardson v. Perales,* 91 S.Ct. 1420, 1427 (1971)).  When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Johnson v. Astrue*, 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The reviewing court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id*. (*citing Walters, supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial evidence in the record, his or her decision is conclusive and must be affirmed.  *Id*. (*citing Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*. (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (*citing Consolidated Edison v. NLRB,* 59 S. Ct. 206, 217 (1938)).  The substantial evidence standard is intended to create a "zone of choice within which the Commissioner can act, without the fear of court interference."  *Id*. (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, it is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently.  *Id*. (*citing Crisp v. Secretary of Health & Human Services*, 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner.  *Id*. (*see Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the

decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record"). "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id*. (*citing Wilson, supra*, 378 F.3d at 545), and the Court therefore "cannot excuse the denial of a mandatory procedural protection . . . simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination. *Id*. (*citing Wilson*, *supra*, 378 F. 3d at 546). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless. *Id*. (*see Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the SSA's procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." *Id*. at *4 (*citing Wilson, supra*, 378 F.3d at 546-547 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)). Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard. *Id*. (*see Wilson, supra*, 378 F. 3d at 547) (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an

"important procedural safeguard" and therefore not a harmless error).  If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination.  *Id.* (*citing Blakley, supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

## VII. DISCUSSION

Plaintiff contends that the ALJ erred in failing to find that her impairments met Listing 1.02 and/or 11.14.  Alternately, the ALJ failed to find that Plaintiff's impairments were medically equivalent to Listing 1.02 and/or 11.14.  Plaintiff also argues that the ALJ does not have substantial evidence from which to conclude that she was not credible or that she is capable of performing light work.

Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal the requirements of any listed impairment.  Further, substantial evidence supports the ALJ's adverse credibility finding.  Defendant contends that substantial evidence supports the ALJ's step five finding that Plaintiff retained the capacity to perform a significant number of light level jobs in the national economy.

### A.    DO PLAINTIFF'S IMPAIRMENTS MEET OR MEDICALLY EQUAL 1.02 AND 11.14 OF THE LISTING?

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  *Griffiths v. Astrue*, 2011 WL 53096, 5 (N. D. Ohio 2011) (*citing* 20 C.F.R. § 404.1520).  In the third step of the analysis to determine a claimant's entitlement to benefits, the claimant has the burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *Id.* (*citing Evans v. Secretary of Health & Human Services*, 820 F.2d 161, 164 (6th Cir. 1987)).  In order to meet a listed impairment, the claimant must show that her

16

impairment meets all of the requirements for a listed impairment. *Id.* (*citing Hale v. Secretary*, 816 F.2d 1078, 1083 (6th Cir.1987)).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Id.* (*citing Sullivan v. Zebley*, 110 S.Ct. 885 (1990)).

### 1.  LISTING 1.02

Listing 1.00 addresses disorders of the musculoskeletal system that may result from hereditary, congenital, or acquired pathologic processes.  20 C. F. R. Pt. 404, Subpt. P. App. 1, 1.00A (Thomson Reuters 2010).  Under 1.02, a major dysfunction of a joint(s) (due to any cause) is characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). *Id.*  In addition there must be involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

The inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. *Id.* at B(2)(b)(1).  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.) *Id.*

The Magistrate reiterates that the burden at step three is on the Plaintiff to prove that she met or

17

equaled the criteria of a listed impairment. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met one of the listed impairments. The ALJ explained how he arrived at the conclusion. Specifically, he noted that Plaintiff failed to satisfy all of the criteria of the listed impairment. There was no documented medical evidence of **gross** orthopedic dislocation, stiffening and immobility of a joint, shortening of the joint or instability. In sum, there is no evidence of an anatomical deformity. There is evidence that Plaintiff uses a cane to ambulate effectively. However, there is no evidence of an **extreme** limitation in Plaintiff's ability to walk. Finally, there is no documented involvement of one major peripheral joint in Plaintiff's shoulders, elbows, or wrists-hands resulting in inability to perform fine and gross movements.

Plaintiff could not demonstrate presumptive disability by showing that her impairments are equal to or meet the severity to those described in 1.02 of the Listing. There was no procedural rules' violation and a reasonable mind would accept as adequate the ALJ's decision that Plaintiff's impairments did not meet or equal the Listing. Accordingly, the Magistrate finds that Plaintiff's claim that she met or equaled 1.02 of the Listing lacks merit.

### 2. LISTING 11.14

Category 11 of the Listing focuses on neurological impairments. Listing 11.14 lists peripheral neuropathies with disorganization of motor function as described in 11.04B, in spite of prescribed treatment. Listing 11.04B states "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)". Listing 11.00C states "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of

18

neurological impairment.  *Id.*  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."  *Id.*

The medical evidence shows that the pain in Plaintiff's hands was attributed to mild osteoarthritis.  Occasionally Plaintiff's fingers were numb.  Plaintiff underwent a medical debridement of diseased toenails.  However, there is no evidence of sustained disorganization of motor function in **two** extremities which resulted in sustained disturbance of gross and dexterous movements or gait and station in spite of prescribed treatment.  In brief, there is no medical evidence on which the ALJ could legitimately find that Plaintiff had disorganization of motor function of the severity specified in Listing 11.14.

### 3.    MEDICAL EQUIVALENCE

Plaintiff suggests that the ALJ erred by failing to find that her impairments were medically equivalent to 1.02 and 11.14 of the Listing.

Medical equivalence is defined as follows:

> We will decide that your impairment(s) is medically equivalent to a listed impairment in Appendix 1 if the medical findings are at least equal in severity and duration to the listed findings ... If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal.  If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

20 C. F. R. § 404.1526(a). (Thomson Reuters 2011).

An impairment or combination of impairments is considered medically equivalent to a listed impairment " * * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments."  *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 788 (N. D. Ohio 2002) (*citing Land v. Secretary of Health and Human Services*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam)).  Generally, the opinion of a medical expert is required before a determination

of medical equivalence is made.  *Id.* (*See* 20 C.F.R. § 416.926(b)).  To show that an unlisted impairment

or combination of impairments is medically equivalent to a listed impairment, the claimant "must present

medical findings equal in severity to all the criteria for the one most similar listed impairment."  *Id.*

(*citing Sullivan v Zebley*, 110 S.Ct. 885, 891 (1990)).

To equal Listing 1.02, Plaintiff's claim that she had back deformity, bone spurs in her left foot,

muscle weakness, numbness in her fingers or torn meniscus must be as severe as a musculosketal

disorder.  Plaintiff's claim of medical equivalency fails as she did not present medical findings equal in

severity to *all* the criteria for the one most similar listed impairment under Listing 1.02.

Under Listing 11.14, Plaintiff must show that these impairments have resulted in serious motor

dysfunction in two extremities.  The ALJ did not err by determining that Plaintiff did not suffer from an

impairment equal to Listing 11.14 as Plaintiff failed to present medical findings equal in severity to all

the criteria for this Listing.

**B.      DID THE ALJ ERR IN ASSESSING CREDIBILITY?**

Plaintiff contends that the ALJ makes a single conclusory statement as to her credibility.  This

is error as the regulations require the ALJ to give specific reasons for the finding of credibility.

The ALJ, not the reviewing court, has the responsibility to evaluate the credibility of witnesses,

including that of the claimant.  *Rogers, supra,* 486 F.3d at 247 (*citing Walters, supra*, 127 F.3d at 531

(6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human

Services,* 667 F.2d 524, 538 (6th Cir. 1981)).  However, the ALJ is not free to make credibility

determinations based solely upon an "intangible or intuitive notion about an individual's credibility."

*Id.* (*citing* SSR 96-7p, 1996 WL 374186, at * 4).  Rather, such determinations must find support in the

record.  *Id.*  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence,

are not supported by objective medical evidence, the ALJ must make a determination of the credibility

of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.*  The entire case record includes any medical signs and laboratory findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record.  *Id.*  Consistency of the various pieces of information contained in the record should be scrutinized.  *Id.* at 247-248.   Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

Social Security Ruling 96-7p also requires the ALJ explain his or her credibility determinations in his or her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*  In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.  *Id.*

The Magistrate finds that the ALJ complied with the requirement that he fully explain his determinations of credibility.  In fact, he explained at length, his consideration of the subjective evidence including Plaintiff's activities of daily living, symptoms, medication, employment history and medical treatments (Docket No. 7, Exhibit 2, pp. 19-23 of 25).  His determinations that overall Plaintiff's allegations are not fully credible, find support in the record.   Therefore, the ALJ's credibility determination will not be disturbed.

C.    DID THE ALJ ERR AT STEP FIVE OF THE SEQUENTIAL EVALUATION?

Plaintiff suggests that the ALJ failed to meet the burden of proof at step five because the jobs do not account for her inability to walk.  In effect, Plaintiff is challenging the finding that she is capable of

sustaining employment which requires significant standing and walking.

At step five of the sequential evaluation, the burden shifts to the agency to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity that has already been determined at step four and a vocational profile. *Hahn v. Astrue,* 2011 WL 1136231, *2 (N. D. Ohio 2011) (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1512(a);*Bowen v. Yuckert*, 107 S.Ct. 2287, 2294 n. 5 (1987) ("[The agency] bears the burden of proof at [S]tep [F]ive, which determines whether the claimant is able to perform work available in the national economy."). The Court is not obligated to consider the VE's responses to questions based on information that the ALJ has decided is not supported by substantial evidence or is not credible when identifying the jobs that claimant is able to perform. *Id.* (*citing Felisky* v. *Bowen,* 35 F. 3d 1027, 2036 (6th Cir. 1994)).

Here, Plaintiff does not attack the category of work or the number of jobs recommended by the VE. Plaintiff contends that light work will not accommodate her need to walk and stand with a cane. The ALJ could only point to Plaintiff's assertion that she needed the cane to ambulate and stand. There is no medical evidence of this necessity. Therefore, the ALJ was not required to rely on her unsubstantiated statement in assessing residual functional capacity. Neither was the ALJ bound by the VE's response to the hypothetical question about ambulating with a cane as the ALJ decided that such contention was not supported by substantial evidence. Exclusion of this standard in identifying the jobs that would accommodate Plaintiff's impairments was not error and did not affect the finding at step five of the sequential evaluation.

**D.     THE SIT/STAND OPTION.**

In her Reply Brief, Plaintiff suggests that the need for a sit/stand option is inconsistent with a residual functional capacity for light work.

TITLES II AND XVI: CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, SSR 83-12, 1983 WL 31253, *3-4 (1983) contains a special situations section that addresses alternate sitting and standing requirements.  The ruling notes that in some disability claims the medical facts lead to an assessment of residual functional capacity which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.  *Id.*  The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting.  *Id.*  Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work.  *Id.*  (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.).  However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  *Id.*  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.  *Id.*  In cases of unusual limitation of ability to sit or stand, a VE should be consulted to clarify the implications for the occupational base.  *Id.*

Here, Plaintiff cannot successfully argue that a sit/stand option is inconsistent with light work. SSR 83-12 does not direct a finding of disability if a sit/stand option is required nor does it suggests that a sit/stand option is inconsistent with light work.  In fact, the rules in SSR 83-12 suggest that there are light jobs that are available for a claimant who can perform light work but  needs to alternate positions. The VE reconciled that the size of the occupational base of a person functionally capable of light work but with a sit/stand option was consistent with the lists of significant jobs that exist in the national

economy that a claimant with a sit/stand option can perform at a light exertional level. The ALJ properly relied on the testimony. The ALJ's analysis of this issue is free of legal error and supported by the record. Since there is a regulation that supports the ALJ's decision and that the ALJ employed the proper legal application of that standard, the Magistrate must support the conclusion.

## VIII. CONCLUSION

For these reasons, the Magistrate recommends that Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date: June 14, 2011

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Also, please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*,

24

638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.